LAW OFFICES

# ALLYN & BALL, P.C.

**480 HAMPDEN STREET**
**HOLYOKE, MASSACHUSETTS 01040**

413 / 538-7118

FACSIMILE 413 / 538-6199

Shawn P. Allyn*
Lisa A. Ball*

*ALSO ADMITTED IN PENNSYLVANIA

November 27, 2019

**By Electronic**

Deepika Bains Shukla
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, Massachusetts 01105

   Re: **_United States v. Steven Vigneault, et al., No.18-cr-30051-MGM_**

Dear Ms. Shukla:

   Pursuant to Local Rule 116.3(a), the Defendant in the above-referenced matter, Steven M. Vigneault, hereby requests the following materials from the government:

1. Copies of all emails to and from the Justice Department to the City of Springfield, any of its agents or the Springfield Police Department regarding Luke Cournoyer's employment, status as an employee, collective bargaining agreement rights, and his position with the Springfield Police Department.

2. Copies of all directives by any agent of the Federal Bureau of Investigations to the Springfield Police Department that Luke Cournoyer not be terminated, disciplined and to remain on the payroll as an employee.

3. Copies of all directives by any agent of the United States Justice Department to the Springfield Police Department that Luke Cournoyer not be terminated, disciplined and to remain on the payroll as an employee.

4. Copy of_every_ payment or payroll check made payable to Luke Cournoyer by the Springfield Police Department since the date of his immunization.

1

5.      All communications by the FBI, its agents, the Justice Department or its agents to and from Captain Phil Tarpey.

Local Rule 116.1 says as much: Discovery of exculpatory evidence "shall occur as soon as counsels' trial engagements permit and in all events within fourteen days after arraignment." Should there be problems with disclosure, either side can make a showing to the Court to seek an exemption "in the interests of justice." See e.g. United States v. Five Persons, 472 F.Supp. 64 (D.N.J.1979).

Pursuant to testimony provided under oath on November 19, 2019 by Police Commissioner Cheryl Clapprood, Luke Cournoyer remains on the City of Springfield payroll as the direct result of directives from the FBI- Justice Department.    These types of interference and directives are classic promises, rewards and inducements offered to witnesses by the government and its agents.

Rather than be on the FBI payroll or being paid from the Justice Department's budgetary funds, it directed a third-party, the City of Springfield to pay the witnesss on its behalf.   The City, of course, is more than complicit in the scheme as it assists them in defending the civil action brought by Steven Vigneault against the Springfield Police Department.  The Springfield Police Department needs Luke Cournoyer to testify consistent with his thirteenth hour revelations as it aides their defense despite the fact that his employment should have been terminated under any reasonable view of the City of Springfield Police Departments Rules, Regulations and Collective Bargaining Agreement.

Since June of 2018, the estimated payroll and other benefits, such as health insurance, which have been paid to Luke Cournoyer under the FBI's directive is well in excess of **$150,000.00**.

This is a surmountable amount of money to secure any witnesses' testimony.

The government has an obligation to produce promises, rewards and inducements offered to witnesses by the government as well as evidence of bias or prejudice on the part of government witnesses was Brady  material which the prosecution was required to turn over to defendants immediately, unless the government sought relief from disclosure requirements; government could not satisfy its obligation by turning over generic information about witnesses. U.S.C.A. Const.Amends. 5, 14; U.S.Dist.Ct.Rules D.Mass., Rule 116.1(a)(5, 7), (d), also quoting directly from United States v. Snell, 899 F. Supp. 17.

Excerpts of Commissioner Clapprood testimony is attached hereto for your review:

- We have been told by the U.S. Attorney's Office that they consider Luke Cournoyer a

    witness, so they would like us to just put him into a place where he's not actively a police

    officer, so that's why he's assigned to property.   See Exhibit A, p. 21, Lines 12-21

- Regardless of what information she had, she would not be able to do anything about Luke Cournoyer's conduct because of the Federal Government - - "I can" <u>See</u> Exhibit A, p. 23. 12-17.

- Nothing in the Collective Bargaining Agreement could prevent the normal course of discipline for an officer based upon the Justice Department's directive. <u>See</u> Exhibit A, p. 29, Lines 18-23.

- Springfield Police Department is not disciplining Luke Cournoyer pursuant to its own policies and regulations as applied to any other similarly situated officer due to the government's directives. <u>See</u> Exhibit A, p. 30.

At this time, this data is needed so my office may prepare for trial.   I have requested this these types of materials on multiple occasions.

Should we not receive the same, I intend to file Motions to Compel the data and request the court to issue third parties subpoenas to obtain the documentation.

I trust you understand my concerns.

Sincerely,

Shawn P. Allyn

Encl.

3

# EXHIBIT A

**(FINAL REQUEST FOR GIGLIO-SNELL DISCOVERY)**

**NOVEMBER 27, 2019 LETTER**

1

1                    COMMONWEALTH OF MASSACHUSETTS

2

     Hampden, ss.                    Superior Court Department
3                                    Docket No. 779CV00060

4

5     STEVEN VIGNEAULT

6        VS.

7     CITY OF SPRINGFIELD, ET AL

8

9

10
     DEPOSITION OF:  CHERYL CLAPPROOD, taken before
11   Sarah L. Mubarek, Notary Public, pursuant to Rule 30
     of the Massachusetts Rules of Civil Procedure, at
12   the offices of Allyn & Ball, 480 Hampden Street,
     Holyoke, Massachusetts 01040, on November 19, 2019,
13   commencing at 12:23 p.m.

14

15
     APPEARANCES:
16   (Please see page 2)

17

18

19

20

21
                         Sarah L. Mubarek
22               Registered Professional Reporter

23

1       APPEARANCES:

2       Allyn & Ball, P.C., 480 Hampden Street, Holyoke,
        Massachusetts 01040, representing the Plaintiff,
3       Steven Vigneault.
        BY:  SHAWN P. ALLYN, ESQUIRE
4
        City of Springfield Law Department, 36 Court Street,
5       Springfield, Massachusetts 01103, representing the
        Defendant, City of Springfield.
6       BY:  LISA DESOUSA, ESQUIRE and EDWARD PIKULA,
             ESQUIRE
7
        Law Offices of Stanley W. Wheatley, 19 Beacon
8       Street, Boston, Massachusetts 02108, representing
        the Defendant, Gregg Bigda.
9       BY:  STANLEY W. WHEATLEY, ESQUIRE

10      Reardon, Joyce & Akerson, P.C., 4 Lancaster Terrace,
        Worcester, Massachusetts 01609, representing the
11      Defendant, Steven Kent.
        BY:  AUSTIN M. JOYCE, ESQUIRE
12
        National Association of Government Employees,
13      1299 Page Boulevard, Springfield, Massachusetts
        01104.
14      BY:  KAREN T. BETOURNAY, ESQUIRE and
             MICHAEL P. CLANCY, ESQUIRE
15

16

17

18

19

20

21

22

23

1           MR. ALLYN:  Standard stipulations,

2     reserve all objections except as to the form, and

3     will the Commissioner like to read and sign?

4           MR. PIKULA:  We would.

5           MR. ALLYN:  Waive notary?

6           MR. PIKULA:  Yes.

7           CHERYL CLAPPROOD, Deponent, having been

8     first duly sworn, deposes and says as follows:

9           DIRECT EXAMINATION BY MR. ALLYN

10    Q.    Good morning.

11    A.    Good morning.

12    Q.    Could you state your name and spell your

13    last name for the record?

14    A.    Cheryl Clapprood, C-l-a-p-p-r-o-o-d.

15    Q.    Would it be okay if I just referred to

16    you as Commissioner throughout the deposition?

17    A.    Sure.

18    Q.    Have you ever had your deposition taken

19    before?

20    A.    Yes.

21    Q.    When was it last taken?

22    A.    Probably about five years ago.

23    Q.    Do you remember what it was taken for?

1          THE WITNESS:  That's fine.

2          (Pause.)

3     Q.    Could I just repeat the question?

4     A.    Sure.

5     Q.    If I remember what I asked you.  I was

6   asking you if you could explain how the rules and

7   regulations are enacted and implemented for

8   Springfield Police officers.

9     A.    When you graduate from the academy,

10  you're signing a form saying that you received the

11  rules and regulations of the department, and you

12  acknowledge that you've read them and understand

13  them.  They're enforced by the supervisors of the

14  police department.

15    Q.    And if you know, in 2016 who was

16  responsible for implementing discipline if an

17  officer violated a rule?

18    A.    It would be the officer's direct

19  supervisor.

20    Q.    And was there a process in place that you

21  have personal knowledge of as to how an officer

22  would be disciplined if it's alleged they violated a

23  rule or regulation?

1        Q.     Did you have any supervisory role over

2    the Narcotics Unit in 2017?

3        A.     No, sir, I did not.

4        Q.     Who was the deputy chief that would have

5    been assigned to the Narcotics Unit in 2017, if you

6    know?

7        A.     I believe it was Deputy Chief Mark

8    Anthony.

9        Q.     And sitting here today, in 2016 or 2017,

10   you have no knowledge that there was an IIU

11   investigation which focused on Narcotics officers

12   drinking on duty?

13       A.     No, sir.

14       Q.     Did you have any say in the promotion of

15   Lieutenant Kent to deputy chief?  Did you have any

16   input?

17       A.     To deputy chief, yes, I had input.

18       Q.     What kind of input did you have?

19       A.     Well, I was present during his interview.

20   He topped the assessment center.  I wasn't at that

21   process, but he came out on top by more than two

22   points over the next candidate.  I was present when

23   Deputy Cochrane and I believe Captain Duda who was

1    acting deputy at the time interviewed then Captain

2    Kent for deputy.

3         Q.    I asked you whether you had any knowledge

4    of whether there was an IIU commissioned in 2016 or

5    2017 regarding Narcotics Unit officers drinking on

6    duty, and you said you did not?

7         A.    I did not.

8         Q.    How about from any other source, say the

9    media?

10         A.    Did I read about it?

11         Q.    Yes, did you read about it?

12         A.    In the media, yeah.  I mean, I did hear

13    that there was an issue with that in Narcotics.  I

14    wasn't involved in any investigation in it.

15         Q.    Now you oversee the Narcotics Unit,

16    correct?

17         A.    I oversee them all, but not directly.

18         Q.    So you were aware then from was it a

19    media source that there was an issue raised of

20    drinking in the Narcotics Unit?

21         A.    Yes, I read that, yeah.

22         Q.    Were you aware that Lieutenant Kent at

23    the time was involved in that matter?

1      A.     Yes.

2      Q.     And did you consider any of that before

3  recommending he be promoted to deputy chief?

4      A.     We took into consideration all the

5  candidates' IIU folders and investigations, yes.

6      Q.     Did you know that he had given a

7  statement to Commissioner Barbieri's IIU unit

8  regarding the allegations of drinking by the

9  Narcotics officers?

10     A.     No.

11     Q.     But did you look at the IIU file before

12  promoting him?

13     A.     What we look at isn't really the whole

14  entire file.  It's any IIU charges and the

15  dispositions.

16     Q.     Do you consider an officer's truthfulness

17  when you consider recommending or weighing in on a

18  promotion?

19     A.     Sure, yeah.

20     Q.     Sitting here today -- strike that.

21  You said he was promoted about four to six months

22  ago, is that accurate?

23     A.     As a deputy, yeah.  I don't know when he

1    made captain.

2         Q.    Were you aware that the federal

3    government had immunized him in a case they suited

4    against Gregg Bigda and Steven Vigneault in the

5    Federal District Court?

6         A.    Yes, I was.

7         Q.    And were you aware that he was immunized

8    due to prior alleged untruthful testimony that he

9    had provided to the IIU unit regarding the drinking

10   allegations?

11                   MR. JOYCE:  Objection.

12        A.    No, I don't think I knew why he received

13   immunization.

14        Q.    Is that something you think would have

15   been important for you to look into before promoting

16   him?

17                   MR. WHEATLEY:  Objection.

18        Q.    You can answer.

19        A.    I looked into what we thought was

20   important at the time.

21        Q.    And at the time you were looking into it,

22   did you think an officer's truthfulness was an

23   important characteristic of promotional aspect?

1    A.    Absolutely.

2    Q.    So did you or did you not consider the

3    fact that he had to be immunized in order to

4    testify?

5              MR. CLANCY:  Objection.

6              MR. JOYCE:  Objection.

7    Q.    You can answer.  Just so you know, and

8    I'll let your lawyer yell at me, so long as he

9    doesn't tell you not to answer.

10             MR. PIKULA:  I'm not going to yell at

11   you.

12   Q.    You know what I mean.  They just have to

13   do that for the record.  So unless someone tells you

14   don't answer.

15   A.    Can you repeat it then?  Sorry.

16   Q.    Yes.  Was the fact that Lieutenant Kent

17   had to be immunized in order to testify for the

18   government, was that a factor --

19   A.    I took it into consideration, yes, sir.

20             MR. CLANCY:  And I'd renew that

21   objection.

22   Q.    And how did it weigh into your decision

23   making process?

1          A.      It obviously didn't affect his promotion.

2          Q.      Luke Cournoyer, you're familiar with him?

3          A.      I am.

4          Q.      How do you know him?

5          A.      I know him from the time he started

6    working at the police department.  Not closely.  I

7    know who he is.  I know a little bit about his

8    family.  I know where he's assigned now.

9          Q.      Where is that?

10         A.      Property room.

11         Q.      Why is he assigned there?

12         A.      He's assigned to the property room

13   because, from what I understand, which I don't

14   understand it fully because no one's helping us out

15   with that, we've asked the AG's office and U.S.

16   Attorney's Office to clarify Luke's status, and we

17   have been denied any information in regards to his

18   status.  We have been told that they consider him a

19   witness, so they would like us to just put him into

20   a place where he's not actively a police officer, so

21   that's why he's assigned to property.

22         Q.      So it's your understanding that the

23   United States government has asked that he remain

1      employed?

2          A.     Yes.

3          Q.     And have they asked you specifically, if

4      you know, meaning you the city, not to implement any

5      kind of disciplinary action against him?

6                     MR. CLANCY:   Objection as to the

7      form.

8          Q.     You can answer.

9          A.     I can't implement any because I don't

10     know what he did.  They won't give me any

11     information.  So all the department discipline's on

12     hold because I can't get any information from these

13     agencies.

14         Q.     What kind of information would you need?

15         A.     What he did wrong, why he was immunized,

16     what he testified to, what he's involved in.  We

17     can't get it at this point in time, so it seems to

18     be on hold for him.

19         Q.     Are you aware before you became the

20     commissioner that the previous commissioner had

21     released Luke Cournoyer's Grand Jury testimony to

22     the District Attorney, who then released it to 300

23     lawyers in Hampden County?

1      A.      No.

2      Q.      So I know you just said one of the things

3      you don't know is you don't know what he testified

4      to?

5      A.      Correct.

6      Q.      Okay.  If the commissioner had his Grand

7      Jury testimony, do you know whether that would be in

8      your office or in IIU file?

9      A.      I don't know where he had it, how he got

10     it or where he kept it.  I do not have it.  We have

11     asked for it.

12     Q.      So you're indicating that if you had his

13     Grand Jury testimony, you would be able to do

14     something about it or you can't because of the

15     government?

16             MS. DESOUSA:  Objection.

17     A.      I can't.

18     Q.      Have you read anything in the newspaper

19     about what Luke Cournoyer testified to in the Grand

20     Jury?

21             MR. CLANCY:  Objection.

22     A.      I don't think so, no, sir.

23     Q.      Are you aware of the allegation that he

1       lied about knowing who kicked a juvenile suspect

2       from the Palmer incident?

3                   MR. CLANCY:   Objection as to form.

4                   MS. DESOUSA:   Objection.

5           A.    I read that in the paper.

6           Q.    So just to avoid all the objections,

7       let's go through the whole thing.   In 2016 did you

8       become aware of an incident that occurred regarding

9       a juvenile stealing a Springfield Police cruiser and

10      taking it to Wilbraham and Palmer?

11          A.    I do.

12          Q.    Can you tell us what you know about that?

13          A.    From what I know about it, it was an

14      undercover vehicle, and it was after a drug raid or

15      a narcotics event, and I believe it was Officer

16      Vigneault went to get a pizza, left the car running.

17      The car was subsequently stolen.   At some point

18      later that evening, Wilbraham or Palmer come across

19      this vehicle, maybe they have a pursuit.   Narcotics

20      officers are notified that this is going on in

21      Wilbraham or Palmer.   I think we had some officers

22      that responded there late night.

23                  There was an incident, and I think it was

1     lied about knowing who kicked a juvenile suspect

2     from the Palmer incident?

3                    MR. CLANCY:  Objection as to form.

4                    MS. DESOUSA:  Objection.

5          A.    I read that in the paper.

6          Q.    So just to avoid all the objections,

7     let's go through the whole thing.  In 2016 did you

8     become aware of an incident that occurred regarding

9     a juvenile stealing a Springfield Police cruiser and

10    taking it to Wilbraham and Palmer?

11         A.    I do.

12         Q.    Can you tell us what you know about that?

13         A.    From what I know about it, it was an

14    undercover vehicle, and it was after a drug raid or

15    a narcotics event, and I believe it was Officer

16    Vigneault went to get a pizza, left the car running.

17    The car was subsequently stolen.  At some point

18    later that evening, Wilbraham or Palmer come across

19    this vehicle, maybe they have a pursuit.  Narcotics

20    officers are notified that this is going on in

21    Wilbraham or Palmer.  I think we had some officers

22    that responded there late night.

23                    There was an incident, and I think it was

1    in the Palmer Police Department, where Officer Bigda

2    and Officer Cournoyer are involved in interviewing a

3    juvenile in a cellblock, and that video

4    subsequently, months later was released.  That's

5    pretty much what I know about that.

6         Q.    Did you learn or did you know about an

7    allegation that a Springfield Police officer

8    allegedly kicked a juvenile?

9         A.    I did.

10        Q.    How did you know that?

11        A.    I think I read that in the paper.

12        Q.    Are you currently monitoring that

13   situation?

14        A.    No, sir.

15        Q.    What is the current status of Gregg

16   Bigda, his employment with your department?

17        A.    I believe he's not working.

18        Q.    Why isn't he working?

19        A.    He was given a 60-day suspension.  I

20   don't believe he was fired, but he's not working

21   with us.  He still has some legal issues to work

22   through, and after the legal issues, he would have

23   departmental issues.

```
1          Q.    Just to back up, do you know why he
2     wasn't fired?
3          A.    I do not.
4          Q.    Now, you're currently the commissioner?
5          A.    I am, yes, sir.
6          Q.    And is it your position that Gregg
7     Bigda's still a Springfield Police officer?
8          A.    I believe he is.
9          Q.    Do you know why today he's not
10    terminated?
11         A.    I do not.
12         Q.    Do you intend to terminate him?
13               MS. DESOUSA:  Objection.
14         A.    I wouldn't terminate him until -- I
15    wouldn't look at it until the legal issues are done.
16         Q.    What is your understanding of what the
17    legal issues are?
18         A.    I believe that he has charges pending
19    against him for that incident in Palmer as to civil
20    rights or who kicked who.  I know his legal issues
21    are continuing before we can go departmentally.
22         Q.    Do you know Edward Kalish?
23         A.    I do.
```

1      disciplined?

2                          MR. CLANCY:   Objection.

3           A.     No, sir, I don't.

4           Q.     Do you know why Edward Kalish was never

5      disciplined?

6                          MR. CLANCY:   Objection.

7                          MS. BETOURNAY:   Objection.

8                          MS. DESOUSA:   Objection.

9           A.     No, sir, I don't.

10          Q.     So Luke Cournoyer is remaining employed

11     at the request of the federal government?

12                         MR. CLANCY:   Objection.

13          A.     Luke Cournoyer's remaining employed

14     because I can't go with any departmental charges on

15     the request of the federal government.   So I can't

16     just terminate him without bringing the charges, and

17     I can't bring the charges until I can get the

18     information, and I can't get the information because

19     they won't give it to me.

20          Q.     And you say you would need to know what

21     he testified to?

22          A.     Correct.   I don't know any of the

23     circumstances surrounding Officer Cournoyer's

1   testimony.

2      Q.    Have you looked into it since you became

3   commissioner?

4      A.    No, because I know that they want the

5   criminal charges to go first, and then it will come

6   departmentally and I'll look into it.

7      Q.    Are you familiar with the collective

8   bargaining agreement process with officers and

9   unions?

10     A.    Yes, sir.

11     Q.    What is your background in dealing with

12  union issues?

13     A.    Just through supervision, problems,

14  dealing with Officer Joe Gentile.  I think we get

15  along pretty good.  Just reading the contract,

16  usually something pops up, an issue pops up, and

17  I've got to refer to the contract.

18     Q.    Can you tell me in the current contract

19  where it prevents you from disciplining an officer

20  because the federal government doesn't want you to

21  do it?

22              MS. DESOUSA:  Objection.

23     A.    It doesn't.

```
1        Q.     It doesn't?

2        A.     No.

3        Q.     So you technically could enforce your

4    rights under the collective bargaining agreement?

5                       MR. PIKULA:   Objection.

6                       MR. CLANCY:   Objection as to form.

7        Q.     Isn't that true, Commissioner?

8        A.     I technically could, sure.

9        Q.     The department is choosing not to

10   implement discipline right now against Luke

11   Cournoyer?

12                      MR. PIKULA:   Objection.

13                      MR. CLANCY:   Objection.

14       Q.     Is that correct?

15       A.     Correct.

16       Q.     Are you familiar with the 90-day rule?

17       A.     Yes.

18       Q.     Okay.  For the record, tell me what your

19   understanding is of the 90-day rule.

20       A.     My understanding is after an incident

21   where department charges may be brought, we have to

22   notify the officer that this may be happening within

23   90 days of the incident, us becoming aware of it.
```

1        Q.      Have you notified Luke Cournoyer of the

2    potential possibility of discipline after having

3    become aware of his testimony?

4                        MR. CLANCY:   Objection as to form.

5        Q.      You can answer.

6        A.      I believe we have, sir, yes.  I believe

7    there was a 90-day letter.

8        Q.      Do you know if any 90-day letter was

9    served on Steven Kent by the police department after

10   they learned about his immunization?

11       A.      I believe there was, sir, yes.

12       Q.      Do you know whether he was disciplined?

13       A.      I believe he was, sir.  I think he had a

14   written reprimand.

15       Q.      So he got what?

16       A.      Written reprimand.

17       Q.      And what was the written reprimand for?

18       A.      It had to do with the drinking in the

19   Narcotics Unit.

20       Q.      Anything in particular that he was

21   written up for?

22       A.      Not that I recall, no, sir.

23       Q.      Did it have something to do with his

1      truthfulness?

2           A.     I don't know, sir.

3           Q.     Isn't that something -- did you just

4      review his file at least four, five months ago?

5           A.     Back before, yeah, I did.

6           Q.     I'll just change gears for a minute and

7      ask you about Gail Gethins if that's okay.

8           A.     Sure.

9           Q.     It sounded like from the summary you gave

10     me that you had a direct supervisory role of Gail

11     Gethins in 2016, is that accurate?

12          A.     Yes.

13          Q.     Can you tell me what that was?

14          A.     Gail Gethins was assigned to the K9 unit.

15     She had a K9.  She reported directly to Sergeant

16     Delaney, but I was over Sergeant Delaney.

17          Q.     Did there come an occasion in March of

18     2016, where Gail Gethins brought to your attention

19     an incident that allegedly occurred at her home in

20     East Longmeadow, Mass?

21          A.     Yes, sir, there was.

22          Q.     Can you tell me how that was brought to

23     your attention?

1    floor, and I think there's one in the garage.

2         Q.    What is the distance between the one in

3    the garage, between that and Narcotics Unit?

4         A.    The distance?  It's in the garage, so

5    you'd have to walk to the end of the garage and up

6    the stairs, around the corner and into Narcotics.

7         Q.    And the soda machine that was in the

8    garage, did the public have access to it?

9         A.    No.

10        Q.    Who would have access to it?

11        A.    Employees of the building.

12        Q.    Then I just have some quick follow-up.

13   With respect to this directive from the government

14   not to take any action against Luke Cournoyer, is

15   that a written directive they've given you?

16        A.    No, I don't believe it was written, sir.

17   We had some verbal communications with some

18   investigators, and that was kind of a verbal

19   request.

20        Q.    Was it a request that was made of you?

21        A.    It was a request made through the

22   Internal Investigations Bureau and Captain Phil

23   Tarpey in my office.  I didn't have any

1    conversations.

2        Q.    Do you know who made the request from the

3    government?

4        A.    I don't.

5        Q.    Can you spell that person's name?

6        A.    Phil Tarpey, T-a-r-p-e-y.

7        Q.    Is he a Springfield Police officer?

8        A.    He's a captain, yes.

9        Q.    Is his legal name Philip?

10        A.    Philip, yeah.

11        Q.    And you have knowledge that that

12    communication was made since you became commissioner

13    or was that at a different time?

14        A.    It was when I was acting commissioner.

15        Q.    That's the reason you're not taking any

16    kind of disciplinary action against Luke Cournoyer?

17                MR. CLANCY:   Objection.

18        A.    It's one of the reasons, sir.  We're

19    going to wait for this investigation to go, and it's

20    my understanding he's been served a 90-day letter.

21    He waived the time period, so we'll get to that as

22    soon as the powers that be let us.

23        Q.    Was Gregg Bigda served a 90-day letter?