UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 18-CR-30051

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN M. VIGNEAULT | ) |
| Defendant. | ) |
| | ) |

**MOTION TO DISMISS THE SINGLE COUNT INDICTMENT & IN THE ALTERNATIVE TO SUPPRESS THE USE OF STEVEN VIGNEAULT'S STATEMENTS MADE IN COOPERATION WITH THE GOVERNMENT**

**I.     INTRODUCTION**

Now comes Defendant Steven Vigneault and moves that this single count indictment be dismissed.  *See United States v. Salemme*, 91 F. Supp.2d 141.

In the alternative, Mr. Vigneault also moves that any statements he made in cooperating with the government be suppressed and that those statements be provided transactional immunity.  Id.  As reasons therefore, Mr. Vigneault states that he had a long history with the United States of America leading up to the indictments before the court, much of which included information he provided to the government, which it has used in the instant indictments, and data which it appears to be using in the publically announced subsequent investigation into the Springfield Police Department, discussed *infra*.

The government knew full well that Mr. Vigneault was not sitting down with them to provide them the incriminating groundwork to launch their investigation into the narcotics unit without the government promising to not use such data against him.   See Exhibit 1, Affidavit

1

of Vigneault. In its grand jury presentment, the government and it agents requested to "prep" Steve Vigneault and choreographed with him his grand jury testimony and lead him to believe it was being presented against Greg Bigda and Luke Cournoyer. See Exhibit 2, February 26, 2018, See Exhibit 3, March 27, 2018 and See Exhibit 4, March 30, 2018 emails from USAA Christopher Perras. The government now unconstitutionally seeks to use those statements against Mr. Vigneault irrespective of the legitimacy of the alleged independent evidence it claims it obtained against him. Much of the alleged independent evidence is non-existent, tainted or now subjected to claims of self-incrimination from the subject sources as discussed herein. In fact, the government's grand jury presentment in this case became so twisted, its one witness who could be deemed neutral testified that he does not know if he even saw a suspect get kicked in the head – let alone by Steven Vigneault:

> Q. So, your version today, if I understand it, I don't have the benefit of having the written statement that you gave earlier, is that you figured something out with the D.O.J., and now, you didn't see a suspect actually get kicked in the head?
>
> A. Correct.

See Exhibit 5, Roger's civil deposition transcript, p. 72, Lines 14-19.

In addition, "under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is 'coerced' evidence and may not be used against the accused." *Rowe,* 676 F.2d at 527. *See also Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 347–48, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); *United States v. Walton,* 10 F.3d 1024, 1028–31 (3rd Cir.1993); *United States v. Rogers,* 906 F.2d 189, 190–91 (5th Cir.1990); *United States v. Swint,* 15 F.3d 286, 290 (3rd Cir.1994); *United States v. Conley,* 859 F.Supp. 830, 835–37 (W.D.Pa.1994). If it is proven that a defendant was induced to make statements to the FBI because its agents caused him to have a reasonable, but erroneous belief that he had a valid

immunity agreement with the government, a constitutional violation has been established and neither his statements nor any evidence derived from them may be used against him. *Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *United States v. Byram,* 145 F.3d 405, 409 (1st Cir.1998).  In this case, any such statements the government seeks to use should be suppressed.

Steven M. Vigneault now stands *severed* from a five-count joint indictment with Defendant Gregg A. Bigda.

The indictments are as follows:

| | |
|---|---|
| Count I: | USOA v. Bigda, Deprivation of Rights by excessive Force in violation of 18 U.S.C. § 242.    Alleged Victim: E.P. |
| Count II: | USOA v. Vigneault, Deprivation of Rights by excessive Force in violation of 18 U.S. C. § 242.    Alleged Victim: D.R. |
| Count III | USOA v. Bigda, Abusive Interrogation in violation of U.S.C. § 242 Alleged Victim(s):   E.P.  & D.R. |
| Count IV: | USOA v. Bigda, Abusive Interrogation in violation of U.S.C. § 242 Alleged Victim:  J.T. |
| Count V: | USOA v. Bigda, False Report in violation of U.S.C. § 1519 Alleged Victim(s): E.P., D.R. and J.T. |

The cooperating data was provided to the United States of America by Mr. Vigneault as a direct result of the government seeking Mr. Vigneault's cooperation in investigating the Springfield Police Department's narcotics unit and events which transpired with the apprehension and interrogations of juveniles as named in his indictment and the indictment of Defendant Bigda.   At that time, the government informed Mr. Vigneault and his counsel that

Mr. Vigneault was <u>not</u> the focus of any criminal conduct and cautioned that he could not lie to the Grand Jury.  See Exhibit 1, Affidavit of Vigneault, See Exhibit 6, Affidavit of Allyn.

Mr. Vigneault does not stand indicted for perjury before a Grand Jury.

## II. ARGUMENT

### A. Government in exchange for cooperation informally agreed that the information provided by Steven Vigneault would not be used against him.

Informal grants of immunity may be oral as well as written. *McLaughlin,* 957 F.2d at 16; *Harvey,* 869 F.2d at 1439; *Lua,* 990 F.Supp. at 709.  In addition, an informal immunity agreement may be express or implied from the conduct of the parties.

More specifically:

While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement. *See* 1 *Restatement (Second) of Contracts* § 19 (1979). *McHan,* 101 F.3d at 1034. *See also Lua,* 990 F.Supp. at 709.

As the Supreme Court has explained:

An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). Among other things, "[a]n implied-in-fact contract arises from '[c]onduct that would lead a reasonable person in the other party's position to infer a promise in return for performance or promise ....' " *Prescott v. Morton Int'l, Inc.,* 769 F.Supp. 404, 410 (D.Mass.1990) (quoting E.A. Farnsworth, *Contracts* § 3.10 at 124 (1982)).

The government in this case granted Mr. Vigneault informal immunity by its actions and representations. To establish entitlement to relief from prosecution on this basis, "the defendant bears the burden of proving that there was a mutual manifestation of assent—either verbally or through conduct—to the agreement's essential terms." *United States v. Jiménez*, 256 F.3d 330, 347 (5th Cir. 2001). Such an agreement may be unwritten, based upon oral statements. Id. It may also be implied from the circumstances. *Hercules v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *United States v. Barford*, 2004 WL 5645086 (E.D. Missouri). In this case, such circumstances exist. The government informed Mr. Vigneault that he was not their focus and was seeking the information to investigate civil rights violations by Greg Bigda and the Springfield Police Department. See Exhibit 1, 6. Based upon the government's representations and the course of events in this case, Mr. Vigneault cooperated with the government and provided the data it requested.

At present, the government wants to contend that there was never a proffer or agreement with Mr. Vigneault leading up to any Grand Jury Indictment. However, in July of 2018, the prosecutor who dealt with Mr. Vigneault, met with Mr. Vigneault, and prepared Mr. Vigneault, had USAA Kevin O'Regean contact Vigneault's counsel requesting to do a "reverse proffer." Since this telephone call came from USAA O'Regan and not USAA Perras, it was suspect for the reasons outlined. See Exhibit 6. This was declined and followed-up with an email and preservation letter, attached hereto at Exhibit 7 (email), and Exhibit 8 (letter attached to the email), Exhibit 9 (follow-up email on blanket medical releases provided to government). Thus, the issue now raised is not new to the government but is now ripe for consideration.

Prior to seeking leave to file the Motions, Defense counsel conferred with the government. The conferencing lead to the government indicating they would be seeking to use

5

the statements Vigneault provided to them despite the fact that they represented throughout the investigation that he was not their focus.  The government even had the audacity to indicate that such motions would be frivolous.  See excerpt of Exhibit 10.[1]   The evidence in this case will show and logic will dictate that the parties understood that the information being provided by Mr. Vigneault to the USAA was not to be used against him in any manner.   For these reasons, the indictment should be dismissed.

      **B.**      **Vigneault provided the government with everything they wanted all while the government lead him to believe he was never their focus**

In this instance, the evidence will show that Mr. Vigneault met his part of the bargain and provided the Justice Department with some of the following data that it wanted in seeking to indict Defendant Bigda and in investigating the Springfield Police Department:

1. Use of intoxicating liquors by narcotic officers while on duty;

2. Use of intoxicating liquors by supervisors while on duty;

3. Manner and place of purchase of intoxicating liquors with drug raid money seized from suspects on various drug raids;

4. Storage of intoxicating liquors in the Springfield Police Department;

5. Abuse of suspects on drug raids;

6. Data surrounding Defendant Bigda's use of other narcotics officers log on credentials for the computer system where applications for search warrants were embellished and not drafted by the particular affiants;

7. Culture and acquiescence of the Springfield Department's Commissioner and Commanding Officers of the conduct of the narcotics unit.

---

[1] Exhibit 10 is redacted to exclude any identifying data of minors or victims.

Moreover, the Justice Department knew that the data it was eliciting from Mr. Vigneault could be incriminatory, such as knowledge of falsified or embellished warrants, use of drug raid money to purchase intoxicating liquors and the abuse of some suspects during raids but continued to assure him he was not their focus nor would they charge him for providing them with the information in seeking an indictment of Greg Bigda and in investigating the narcotics unit.  "It is well-settled that proffer and plea agreements are construed according to principles of contract law." *United States v. Pollack*, 91 F.3d 331, 334 (2d Cir. 1996). "[O]nce a defendant's good-faith compliance with the terms of the agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is *per se* a bad faith prosecution." *Rowe v. Griffin*, 676 F.2d 524, 528 (11th Cir. 1982).   In determining whether a plea agreement has been breached, we look to the reasonable understanding of the parties and resolve ambiguities against the government.  *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999).

At present, the government would have the Court believe that Mr. Vigneault was promised nothing all the while providing inculpating data of the internal workings of the Springfield Police Departments' narcotic's unit.   In such circumstances, the First Circuit holds that such conduct is construed according to contract principals, looks to the reasonable understanding of the parties and resolves ambiguities *against* the government.  *United States of America v. La Luz-Jimenez*, 226 F. Supp.3d 79 (2017).

To add to this, once the government began debriefing Vigneault, it then held a press conference with the City of Springfield indicating that it was launching a separate and distinct or expanded investigation of the Springfield's Narcotics Unit.  <u>See</u> foregoing Article: " US Department of Justice launches investigations into possible civil rights violations by the Springfield Police narcotics unit."

7

Link:

https://www.masslve.com/news/2018/04/us_department_of_justice_to_in.html

See also, Exhibit 11 (FBI debriefing scheduling of Vigneault at the FBI Field Office in Springfield – ("we'll meet at the FBI to avoid shenanigans" –USAA).

The shenanigans the USAA was referring to was the continued attacks upon Steven Vigneault and the cover-ups being engaged in by the other narcotics officers and the Police Commissioner Barbieri.  The course of the relations with Mr. Vigneault also has to be considered in the context of this case and the evidence presented against him.  See Paper 94 (Motion to Sever).  As an example, for months, the non-victim witnesses in this case lied to cover up what Mr. Vigneault had *blown the whistle* on relative to the functioning of the Springfield Police Narcotic's Unit to a point that the government had to immunize the witnesses in order to verify that everything Vigneault informed them of relative to the consumption of intoxicating liquors on shift and location of storage of those liquors was true.  The government then used this information to indict co-defendant Gregg Bigda.

As the pressure closed in on Luke Cournoyer he lawyered up with Attorney William Bennett.  There is indication in the record that Bennett provided "talking points" to the F.B.I. in trying to avoid Luke Cournoyer from being indicted.  The government has refused[2] to provide the talking points or attenuating data which lead up to Luke Cournoyer's sudden revelations that Steve Vigneault told him he "kicked a kid."  To add to this, the dizzaling tail of Luke Cournoyer completely contradicts all of his conduct leading up to the sudden revelations.  He engaged in a concerted effort for two years with all the other narcotics officers in lying,

---

[2] Motions will be filed seeking all this data including all evidence of promises, rewards and inducements.

8

consulted with them and in filing false police reports in these efforts. This was not done to protect Steven Vigneault. They *hated* Steven Vigneault. The conduct was engaged in to protect Greg Bigda, their jobs and themselves. In fact, each narcotics officer invoked his Fifth Amendment Right of Self-Incrimination when first called to Grand Jury as they knew the reports they filed claiming Steven Vigneault lied about their conduct were all false.

### III. The Independent Evidence is not legitimate, is tainted, is a complete sham and violates Steven Vigneault's Due Process Rights

The government's case is not legitimate and is a complete shame against Mr. Vigneault. A review of the evidence and how it was obtained is relevant in considering the subject request for relief. When the government obtains evidence as a result of a formal or informal grant of use and derivative use immunity, and it appears that such evidence may have been misused to secure the defendant's indictment, the case against him must be dismissed unless the government proves by a preponderance of the evidence that it had a **legitimate**, independent source for the information presented to the grand jury or, if the government cannot disprove taint, that the error was harmless beyond a reasonable doubt. *Kastigar,* 406 U.S. at 460; *United States v. Schmidgall,* 25 F.3d 1523, 1530–31 (11th Cir.1994) ("*Schmidgall I* "); *United States v. Schmidgall,* 25 F.3d 1533, 1538 (11th Cir.1994) ("*Schmidgall II* "); *United States v. Bartel,* 19 F.3d 1105, 1112 (6th Cir.1994); *United States v. Palumbo,* 897 F.2d 245, 251 (7th Cir.1990); *United States v. Poindexter,* 951 F.2d 369, 377 (D.C.Cir.1991). If, however, statements were made involuntarily as a result of an unauthorized promise of immunity and used, directly or indirectly, to secure the defendant's indictment, the remedy is suppression at trial rather than dismissal of the case. *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

### A.     D.R identifies his interrogators as his attackers

The most glowing stretch of the government's case is that D.R., the alleged victim, has identified Luke Cournoyer and Greg Bigda as the two who attacked and interrogated him even describing the very clothing Luke Cournoyer was wearing as cited, <u>infra</u>.

### B.     Government immunized the wrong cooperator and the "kicker"

Steven M. Vigneault is only charged with one of the five counts which involves the alleged kicking of D.R.    D.R. has identified Luke Cournoyer and Defendant Bigda as his attackers.  *See* Defendant's Motion to Sever, <u>ECF Paper No 94, Exhibit 9</u>[3].  D.R.'s own testimony to the Grand Jury in this case exculpates Vigneault. See Exhibit 9 G.J. Exhibit 71, January 13, 2017 Justice Department Interview of D.R. p. 8, Lines 20-22, p. 11, Lines 14-22, p. 18, Lines 11-16, p. 21, Lines 7-8. P. 22, Line 4, p. 23, Lines 22, p. 24, Lines 1-7, p. 28, Lines 13-22.

Compare D.R's testimony at page 24, Lines 1-7 with the language of the government indictment against Bigda in Count Five, Defendant Bigda kicked juvenile suspect E.P. in the head, spat on him, and said, "welcome to the white man's world."  D.R. unequivocally stated to the Federal Agents what his kicker said to him. <u>Id</u>. at p.  46, Lines 8-12.

Compare D.R.'s testimony against Count III of the indictment, Defendant Bigda threatened to among other things, "crush D.R.'s skull and fucking get away with it;" fucking kill D.R. in the parking lot……;" "kick D.R. right in the fucking face as soon as [they] cross the Springfield Line."   D.R. unequivocally described how his kicker was talking and who he was.  See further, <u>Id</u>.,  p. 44, 20-22, p. 45, Lines 1-3.

---

[3] This exhibit is already filed under seal in this case.

As to Luke Cournoyer, the court should weigh the description of clothing provided by D.R.  See Id., p. 29, Lines 4-8, p. 32, Lines 9-16, p. 45, Lines 18-19.  Contrast this testimony to the public still-image on the public video.



**C.       Government set up a Million Dollar Deal for Luke Cournoyer to the detriment of the City of Springfield Taxpayers & then turned around and suggested the Police Commissioner was a liar or "mixed up" her words**

Mr. Vigneault has repeatedly requested the government to provide him with all promises, rewards and inducements which have aided Luke Cournoyer.   The government has resisted all inquiries and represented prior to November of 2019 that it had absolutely no role in Luke Cournoyer's continued employment.   This is not true.   The government has gone to extremes whereby providing Luke Cournoyer with promises and rewards which are valued at over a million dollars including his employment, health insurance benefits and retirement benefits in seeking him to maintain his thirteenth hour confession.   But for the government's request, Luke Cournoyer would no longer be employed as a Springfield Police Officer.

See Exhibit 12:

Excerpts of Commissioner Clapprood's testimony is attached hereto for your review:

- We have been told by the U.S. Attorney's Office that they consider Luke Cournoyer a witness, so they would like us to just put him into a place where he's not actively a police officer, so that's why he's assigned to property.   See Exhibit 12 , p. 21, Lines 12-21

- Regardless of what information she had, she would not be able to do anything about Luke Cournoyer's conduct because of the Federal Government - - "I can't "  See Exhibit 12 , p. 23. 12-17.

- Nothing in the Collective Bargaining Agreement could prevent the normal course of discipline for an officer based upon the Justice Department's directive.   See Exhibit 12, p. 29, Lines 18-23.

- Springfield Police Department is not disciplining Luke Cournoyer pursuant to its own policies and regulations as applied to any other similarly situated officer due to the government's directives.  See Exhibit 12 , p. 30.

The government then responded by implying the Police Commissioner was not being Truthful or "mixed up her words."  The Commissioner, in response, doubled down on her deposition testimony.  See:  https://www.masslive.com/news/2019/12/springfield-police-commissioner-cheryl-clapprood-says-she-didnt-mix-up-words-regarding-discipline-of-whistleblower-officer.html

 Luke Cournoyer is a heavily paid F.B.I. witness.

He is not a whistle blower as defined under the act as having disclosed wrongdoing that could affect public safety.  Cournoyer, in fact, lied to all investigative bodies and filed false reports to cover up his own conduct.  He was immunized short of being indicted.  His indictment would have directly resulted in the termination of his employment, health insurance, other benefits and his lifetime municipal retirement.

During these periods of time, everything Luke Cournoyer did was to save himself and Greg Bigda, along with all high ranking officials at the Springfield Police Department.  This was further evidenced by the deposition testimony of Springfield Police Officer John Delaney:

> Q. Did you tell the FBI that you believed someone high up in the Springfield Police Department liked Bigda to keep Bigda from being fired after he broke into Gethins' residence and after the Palmer incident?
>
> A. That's what I believed, yes.
>
> Q. And why did you believe that?
>
> A. Because that's what happened.

Q. You believe that's in fact what happened?

A. Yes.

<u>See Exhibit 13</u>, p. 26

Cournoyer's testimony is valued at over one-million dollars. Moreover, it is unclear if his immunity deals cover the ongoing investigations announced by the USAA as to falsified search warrants with his log-on credentials and abuse of other suspects as launched after the debriefing of Steven Vigneault.

**D.** <u>**Gethins is a scorned women with an axe to grind and now invokes her Fifth Amendment Rights of Self-Incrimination as to her testimony**</u>

Gethins has done nothing but lie to the Federal Bureau of Investigation and the Grand Jury in this case from the start. Gethins has testified to her convenience and to suit her retaliatory needs. A few examples are as follows:

- She was instructed by the FBI not to delete text messages or images from her phone regarding the events with Steve Vigneault and the attenuating circumstances.

- Gethins then went ahead and deleted text messages from her phone.

- She told the FBI that Steve Vigneault <u>texted</u> her that he kicked the kid.

- The FBI found no such text messages on her phone.

- She told the FBI that she told Sargent John Delaney and Deputy Chief Cheryl Clapprood at the time (2016) that Vigneault told her he "kicked a kid."

- In her own civil deposition in October of 2019, Gethins asserted her Fifth Amendment Privilege of Self-Incrimination when asked about her multiple versions of events, including to the Federal Grand Jury in this case.

The text messages were not found on her phone because Steve Vigneault never sent any

such text messages. Gethins never reported that Steven Vigneault told her he kicked a kid to John Delaney or Cheryl Clapprood in 2016 because it never happened. In 2016, Gethins was still in a relationship with Vigneault and traveled on multiple occasions to visit him when he was at the Veterans Hospital. The government knew all this because they had full access to Steven Vigneault's medical records and interviewed John Delaney. The F.B.I. never interviewed Cheryl Clapprood. Her deposition testimony now provides a logical reason why they omitted to interview her. Clapprood wanted Luke Cournoyer fired. This was too risky to put before the Grand Jury or the implicit payment arrangement which was securing his testimony.

Sergeant John Delaney testified under oath on November 19, 2019 that Gethins never reported that to him and if she did, he would have reported it to his supervisors.

> Q. Sergeant Delaney, did Gail Gethins ever go to you and say Steve Vigneault kicked the juvenile?
>
> A. Don't recall her saying that.
>
> Q. Did you tell them you don't recall or it never happened?
>
> A. I don't believe she ever did. I think that's something I would remember, but I don't recall.

See Exhibit 13, Deposition Excerpt, p. 20.

Delaney further testified that he would have reported that to his supervisors if Gethins had in fact ever said that to him and that the issue as to who kicked any kid was well known through the department. Moreover, Delaney said it was his obligation to have reported such alleged reports of Gethins. Id. p. 20-22. .

Similarly, Gethins told the FBI that she told Police Commissioner Clapprood at the time that Steven Vigneault told her he "kicked a kid." This in fact never happened. Gethins never

15

told Clapprood any such thing in 2016.  In fact, Gethins created the version in 2018, after she received a subpoena to appear at the DLR to talk about her text messages to Steve Vigneault which said, they are "bluffing you, do not resign."   At this point in time, she learned Vigneault had been cheating on her and she teamed up with IBPO Joe Gentile who gave her a police escort to the DLR to provide her new version of events.

See Exhibit 12, Clapprood' s Deposition, p. 46.

Gethin's testimony is tainted and a complete sham in addition to her recent invocation of her Fifth Amendment Right of Self-Incrimination.


**IV.     There exists a good-faith basis to raise Dismissal under the Due Process Clause and use immunity.**

In this case, given the issues raised, the court has the authority to determine the concept of "nonstatutory" immunity whereby the court will enforce informal or procedurally flawed grants of immunity on equitable grounds.  Id., also quoting Rowe, 676 F. 2d at 524.   As it did in La Luz-Jimenez, it defies logic in this case to allow the government to now use any such statements made by Mr. Vigneault against him at trial.

To quote the First Circuit:

"in other words, to accept the government's theory would mean that the
Government "would have the cake and eat it too." The government cannot have
it both ways.  The court reminds the government that "[h]aving one's cake and eating
it too, is not in fashion in this circuit.  United States v. Tierney, 760 F. 2d 382, 388
(1st Cir. 1995)(other citations omitted).


Whether this indictment should be dismissed under the Due Process grounds is a real issue in this case.   When fundamental fairness requires as a matter of fair conduct the government ought to be required to honor such agreement when it appears from the record that an agreement was made, the defendant performed on his side and the subsequent prosecution is

directly related to an offense in which the defendant, either assisted with the investigation or testified for the government.  *See U.S. v. Salemme*, 91 F.Supp.2d 141.

In the case before the Court, <u>both</u> circumstances are present.

Mr. Vigneault assisted with the investigation and testified for the government.

### V. Court should grant Mr. Vigneault an evidentiary hearing

The Court should grant Mr. Vigneault an evidentiary hearing due to the course of conduct alleged in this case.  The Appeals Courts have repeatedly indicated that such Motions require the Court to hold a hearing and when determining such issues advises that the Court must look to the reasonable understanding of the parties and resolve ambiguities against the government.  See *Salemme*, supra, see also *United States v. La Luz-Jimenez*, 226 F. Spp. 3d, 79, 82.

### CONCLUSION

For the foregoing reasons, the Defendant asserts that there is a good-faith, reasonable basis to file a Motion to Suppress and Dismiss and prays that this Motion be allowed.

FOR THE DEFENDANT
STEVEN M. VIGNEAULT
BY HIS ATTORNEY,

/s/ Shawn P. Allyn
Shawn P. Allyn
Allyn & Ball, P.C.
480 Hampden Street
Holyoke, MA 01040
BBO#643237
Tel: 413 538-7118
Fax: 413 538-6199

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that the foregoing Motion to Dismiss has been filed through the Electronic Case Filing System, it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on December 16, 2019.

                                            <u>/s/ Shawn P. Allyn</u>
                                            Shawn P. Allyn